L. E. FOSGATE COMPANY *vs.* SPOKANE VALLEY GROWERS UNION.

SPOKANE VALLEY GROWERS UNION *vs.* L. E. FOSGATE COMPANY.

Suffolk.   January 4, 1928. — March 2, 1928.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, & SANDERSON, JJ.

*Sale. Contract,* What constitutes, Construction. *Agency,* Existence of relation. *Evidence,* Competency, Of custom. *Practice, Civil,* Exceptions. *Words,* "Handle."

At the trial together of an action by a seller of apples shipped from the State of Washington against a buyer in Boston and of an action by the buyer against the seller based on a modification, through an exchange of telegrams, of the original contract of sale after rejection of the apples by the buyer as not being according to the contract of sale, a determinative question was the purport and meaning of the telegrams. It appeared that a telegram to the seller, transmitting an offer by the buyer, was sent by one whom the seller had consulted, but to whom no specific authority to adjust had been given. The reply telegram adopted the terms proposed by the buyer and was communicated to the buyer. *Held,* that

  (1) In view of the acts of the parties, no question arose as to whether the sender of the telegram to the seller had authority to act for the seller, because, whatever his authority, his agreement as to the terms of adjustment with the buyer was adopted by the seller;

  (2) While the construction of the telegrams, if the cases turned on their construction, was a question of law for the court, a leaving of their construction to the jury in the circumstances was not prejudicial error, since the jury had construed them correctly;

(3) There was no error in the admission of evidence that there was a custom or usage in the fruit and produce trade with reference to the meaning of the word "handle," used in the telegrams, and that according to such custom or usage the word meant "to handle on consignment for the account of another" as distinguished from to "take on one's own account as a buyer."

TWO ACTIONS OF CONTRACT described in the opinion. Writ in the first action in the Municipal Court of the City of Boston dated November 8, 1921, and in the second action in the Superior Court dated December 27, 1921.

The first action was removed to the Superior Court, where the two actions were tried together before *J. F. Brown*, J. Material evidence, rulings by the trial judge and exceptions by the Spokane Valley Growers Union are stated in the opinion. There was a verdict for the plaintiff in the first action in the sum of $467.88, and for the defendant in the second action. Spokane Valley Growers Union alleged exceptions in both actions to the admission in evidence of certain correspondence, on the ground that no authority of Lockwood to act for Spokane Valley Growers Union, or of one Lane to act for the broker, was shown; to the judge's leaving it to the jury to construe "Exhibits 15 and 16," the telegrams of November 17, 1919, quoted in the opinion; to admission of evidence as to the meaning of the word "handle," described in the opinion; and to a refusal by the judge to order verdicts for the Spokane Valley Growers Union.

The cases were submitted on briefs.

*S. L. Bailen & R. B. Brooks*, for Spokane Valley Growers Union.

*J. Cavanagh*, for L. E. Fosgate Company.

PIERCE, J.   These are two actions of contract arising out of the purchase and sale of ten cars of apples, and the consignment of another car to the buyer to auction for the seller's account. The buyer was the L. E. Fosgate Company, a corporation and commission merchant of Boston, and the Spokane Valley Growers Union, an incorporated fruit growers' association of Opportunity, Washington, was the seller. The former is hereafter referred to as "buyer" and the latter as "seller."

The seller's action, brought one month after the buyer's action, seeks to recover the sum of $2,508 claimed as the purchase price of one car of apples alleged to have been accepted and disposed of by the buyer; the sum of $1,117.94 claimed as the net proceeds received by the buyer on a car of apples alleged to have been auctioned by the buyer for the seller's account; the sum of $720.80 claimed as damages for the balance of a loss sustained by the seller on the resale of four cars of apples alleged to have been wrongfully refused by the buyer; and the sum of $200 claimed to have been laid out and expended by the seller for the telegrams, inspection fees, and reports in connection with the wrongful refusal; making a total of $4,096.02 exclusive of interest. The buyer's action is to recover the sum of $940.55, less $234.90 which was collected from a carrier on a claim for broken boxes after the action was brought, as the balance due on an alleged new or substitute agreement by which the buyer was to handle for the account of the seller seven cars of apples, advancing an amount equivalent to five drafts on certain cars named, and to account for the proceeds deducting all its charges and advances. The cases were tried together by a jury, and, after verdicts for the buyer, both actions are before this court upon the seller's exceptions to the admission of certain evidence and to the refusal of the presiding judge to make certain rulings requested, to his refusal to direct verdicts for the seller, and to his denial of the seller's motions for a new trial.

The exceptions taken at the trial which are not presented on the brief of the seller are deemed to be waived.

The facts which are pertinent to the exceptions briefed are in substance as follows: On October 18, 1919, the buyer, acting through a produce broker in Boston, the Atlantic Brokerage Company, hereinafter called the broker, agreed to purchase of the seller, whose place of business was in Opportunity, in the State of Washington, five cars of apples of described grades. On October 21, 1919, the buyer through the same broker agreed to purchase five additional cars of apples of the kind and description as were agreed to be purchased on October 18, 1919. The broker wired the offer

to the seller, received reply telegrams, made out and delivered to the parties written confirmations of the sales, and, in accordance with the requirement of sales, transmitted to the seller an advance payment of $1,000, to be credited $500 on fifth or last car of each order, and was paid by the seller a brokerage of $25 per car. The correspondence, consisting of telegrams, confirmations, and letters leading up to and embracing the sales and covering the payment of the brokerage, were offered in evidence and marked as exhibits at the trial.

On November 10, 1919, three cars arrived in Boston and were inspected by the buyer; two of them were found to be below the contract requirements as to size and quality, and the buyer refused to take any of them. On October 23, 1919, three more cars were shipped and arrived in Boston by November 11, 1919. On inspection the buyer refused to take them contending that in quality and grade they were not according to purchase. About this time a car of the seller's apples, sold through the broker to one Strock, arrived and was refused by the purchaser because, as contended, the apples did not comply with the quality of those contracted for. On November 11, 1919, the broker telegraphed the seller of the buyer's refusal of these shipments, and suggested a discount of fifty cents per box.

On November 13, 1919, the seller sent to H. B. Lockwood, Hyde Park, Massachusetts, the telegram which follows: "Ten cars Jonathans sold Fosgate 56 Clinton Street Boston arriving being refused claiming over five percent stings stem punctures less than fifteen percent color on fancy Sold by Atlantic Brokerage who have Washington rules Food Inspector report unsatisfactory Think whole bunch trying to do us out fifty cents box Want you investigate without disclosing authority Wire quick report real facts with name reliable lawyer Papers Fourth Atlantic Bank Arrivals B & M tracks Milwaukee cars four hundred series 342 103 and 176 also GN 52940 and NH 22006." H. B. Lockwood resided at Opportunity during the years 1912 to 1917, where he was engaged in the apple growing business and was personally acquainted with the president and general manager of the

seller.   Outside the telegrams there was no direct evidence of any authority given Lockwood to act for the seller.   At this time six cars were on the track at Boston, and also the Strock car.   Sometime between November 13, 1919, and November 15, 1919, Lockwood inspected the fruit, and in the early morning of November 15, 1919, sent the following telegram to the seller: "I inspected fruit one car accepted others poor grading size color blemishes I was advised by responsible party and I think he is right that it is advisable to make adjustments Storage out of question. . . ."   The same day the seller wired Lockwood in reply: "Find out advise quick best adjustment possible six cars there."   November 15, 1919, in the afternoon the broker sent the seller the following telegram: "Fosgate considers in view of fact that the government Otis your Lockheart [Lockwood] Fosgate and other inspection proves the apples to be not as ordered that it wouldnt be advisable for them to pay drafts as presented to secure possession of apples all agree not theirs personally we believe Fosgate would accord you the very best of treatment why not allow us adjust think their original offer liberal . . . ."

It was in evidence that the telegrams between Lockwood and the seller were shown to one Lane, the manager of the broker, and that after a consultation with one Heintz, the manager of the buyer, in the presence of Lockwood Lane wanted to know what was the best proposition Heintz had to offer as to taking the apples.   Heintz testified as follows: "I said . . . I would pay two drafts if he would release one bill of lading to me, and I would sell the three cars.   After they were sold I would figure how many more drafts I could pay so that I would be fairly safe, and I would handle the six cars for the Spokane Valley Growers Union."   After this consultation, on November 17, 1919, Lockwood wired the seller as follows: "Fosgates best proposition will handle fruit now here pay two drafts today providing you release one bill of lading without payment handling apples at auction all his charges free without expense to you Consider this very best thing to do Cars on demurrage would advise acceptance."   In reply thereto on the same day the seller wired

Lockwood: "Alright we accept Fosgate proposition He to pay drafts take five cars there and auction other our account without charge which car shall we release"; and later the same day wired him again: "Find out advise best adjustment possible Samuel Strock 59 Clinton Street Jonathans shipped him on wire from Atlantic Brokerage at two ten fob Erie car 61498."

There was uncontradicted evidence that on November 17, 1919, the broker (Lane) called by telephone the buyer and said "Mr. Lockwood was there and wanted to know if we could fix up those apples, said he had authority from the Spokane Valley Growers Union [the seller] . . . to effect an adjustment"; and that Heintz (the buyer) replied: "The only way I will do is as I told you before"; that after further talk Lane said, "Can't you pay more drafts than two?   Mr. Lockwood wants to get all the drafts paid he possibly can"; that Heintz finally agreed that he would pay five drafts instead of the original agreement to pay two, if the seller would release "that car and the Strock car," which Lockwood had told Heintz was rejected, and handle them for the Spokane Valley Growers Union.   That Lockwood immediately telegraphed the seller the substance of the adjustment which the buyer would make, and that the adjustment was accepted by the seller were evidenced by the telegram of Lockwood to the seller, "Release car 400542 Fosgate willing to handle Strocks car at auction best I can do," by the reply wire on the same day, "Wiring bank deliver Fosgate ladings car mentioned and car shipped Strock upon payment other five drafts Fosgate to auction two released our account You attend and report with bill for all trouble," and by the further uncontradicted evidence that the bank communicated directions of the seller to release seven cars to the buyer upon payment of five drafts, and that thereupon the buyer paid five of the drafts and took up the bills of lading covering the seven cars of apples on track, while the four cars that had been held in transit were diverted and resold by the seller.

Whatever should have been the proper construction of the telegrams dated November 17, 1919, between Lockwood and the seller, on the parol evidence of what took place after

November 17, 1919, it is plain the jury would be warranted in finding that Lockwood, purporting to have authority to act for the seller, sought of the buyer its terms for a different adjustment of the rights and obligations of the parties than was shown by the telegrams of November 17, 1919; that Lockwood and the buyer came to terms and that that agreement was communicated by Lockwood to the seller and accepted by it.

The questions whether the full terms were communicated to the seller by Lockwood and whether the seller accepted such terms as an agreement of adjustment between it and the buyer, manifestly did not involve the construction and interpretation of a written contract, but whether the oral agreement proposed by the buyer was sent by Lockwood and accepted by the seller. In view of the acts of the parties, no question arose as to whether Lockwood had authority to act for the seller, because whatever his authority his agreement as to the terms of adjustment with the buyer was adopted by the seller. If the case turned upon the construction to be given the telegrams of November 17, 1919, that construction was one of law for the court and ought not to have been left to the jury. We are of opinion, however, that the jury answered the question correctly and that the error was harmless. *Erickson* v. *George B. H. Macomber Co.* 211 Mass. 311, 317, 318.

We think there was no error in the reception of the evidence that there was a custom or usage in the fruit and produce trade with reference to the meaning of the word "handle," and that according to such custom or usage the word meant "to handle on consignment for the account of another" as distinguished from to "take on one's own account as a buyer." Indeed the word "handle" is used in this sense in the telegram of the broker to the seller on November 13, 1919, wherein it is said "Fosgate wants to know positively your position to enable them to protect themselves or we will handle apples for you selling at auction."

We find no error harmful to the seller in the admission of evidence or in the part of the charge which is reported. In each case the exceptions must be overruled.

*Exceptions overruled.*